GEORGE F. RYAN & another *vs*. CHARLES E. REED & Co.

Essex.    January 16, 1929. — February 26, 1929.

Present: RUGG, C.J., CROSBY, PIERCE, CARROLL, & SANDERSON, JJ.

*Corporation*, Officers and agents. *Agency*, Scope of authority, Ratification by principal.    *Contract*, Consideration, Under seal, Construction, Validity.

An inventor sent a letter to a corporation "directing attention" to a certain machine which he had "just . . . perfected," and expressed a hope of hearing from the corporation.    The corporation replied that the subject was of interest to it and requested the inventor to hold the matter open for a time, when the president of the corporation would call upon him to investigate the proposition "with a view of making some kind of deal with you if it develops that there is a satisfactory market for your inventions."    After some further correspondence, the president, who was also a director, and another director had a conference with the inventor, at which the machine was demonstrated to them. Another conference was had the next day, at which was present also an attorney who had been working on a patent for the machine.    After examination and discussion of the papers and drawings, the president instructed the attorney to finish and file the papers, and said to him that, when everything was ready, he was to send his bill for services to the corporation; and that he was working from that time for the corporation and not for the inventor.    A contract under seal thereupon was executed, whereby the inventor agreed to assign his application for a patent to the corporation which, in consideration thereof, agreed to issue to him a certain number of its shares of stock and to redeem them within a specified time.    The contract contained no warranty that the machine was patentable.    The president stated therein that he was "duly authorized" by the corporation and that he would "personally guarantee" performance by it.    The contract was signed by the president individually and also as president in behalf of the corporation.    The by-laws of the corporation, of which the inventor had no

actual knowledge, gave the president authority to execute contracts "subject to the control and direction of the Board of Directors." The inventor duly filed application for a patent and then assigned his application to the corporation, and the assignment, after being returned from the patent office, was forwarded by the attorney to the corporation and kept by it. The attorney sent his bill for services to the corporation and it was paid by a check of the corporation signed by its treasurer. The inventor thereafter sent a letter to the corporation requesting the issuance of stock to him, to which it replied suggesting the cancellation of the contract and the making of a new one to include certain provisions which the board of directors thought had been omitted from the contract unintentionally. The inventor declined such suggestion and brought an action on the contract against the corporation, at the trial of which the trial judge denied a motion by the defendant that a verdict be ordered in its favor. *Held*, that

(1) In the circumstances, the defendant's by-law as to the authority of the president had no force, binding on the plaintiff as a matter of law, as a limitation upon the president's authority to make the contract with the plaintiff;

(2) Findings were warranted that the president had ostensible authority to execute the contract on behalf of the corporation; and that the corporation ratified such act;

(3) The fact that the contract was under seal imported a valid consideration for the agreement by the defendant;

(4) A finding was not required that the defendant entered into the contract in reliance on a misrepresentation by the plaintiff that the machine was patentable;

(5) Under the provisions of the contract, the only thing sold by the plaintiff and bought by the defendant was the plaintiff's interest in his application for a patent;

(6) The motion by the defendant properly was denied.

CONTRACT. Writ dated July 16, 1925.

Material portions of the pleadings, and of the evidence at the trial in the Superior Court before *Greenhalge*, J., are stated in the opinion. At the close of the evidence, the judge denied a motion by the defendant that a verdict be ordered in its favor. The jury found for the plaintiffs in the sum of $13,284.62, and the defendant alleged exceptions.

*E. B. Cook*, (*H. C. Splane* with him,) for the defendant.

*J. W. Santry & E. S. Underwood*, for the plaintiffs.

PIERCE, J. This is an action of contract, tried to a jury, in which the plaintiffs in their amended declaration allege, in substance, that on November 13, 1924, they made a contract in writing with the defendant, a copy of which is annexed to the declaration, whereby they assigned to the de-

fendant three applications for patents, and certain machines built in accordance with said applications, with all wood patterns and drawings in connection therewith, and the defendant in consideration thereof, agreed to issue to the plaintiffs preferred stock of the defendant company to the value of $15,000, and to redeem $2,500 worth of said stock during the month of January, 1925, and the balance thereof, $12,500, within three years from November 13, 1924; "that the plaintiffs have done everything that they are required to do under said agreement but the defendant has refused to issue said shares of stock or pay said sums of $2,500 and $12,500; wherefore the plaintiffs say that the defendant owes them the sum of $15,000."

The defendant's answer is a general denial, payment, a denial of its signature to the agreement, with a demand that it be proved at the trial; and the further answer that the plaintiffs made false and fraudulent representations concerning material facts, which were relied upon by the defendant and were an inducement to its entering into the alleged contract.

At the close of all the evidence the defendant requested the court, in writing, to direct a verdict for the defendant; this request was refused and an exception taken. The defendant also saved exceptions to the admission or exclusion of certain evidence, and to the refusal to give or to the giving of certain instructions, all of which will be considered as they are referred to and argued in the defendant's brief.

The answer does not deny that the defendant is a corporation, G. L. c. 231, § 30; and the defendant states in its brief that "It is not denied that Charles E. Reed, president of Charles E. Reed & Company, affixed his signature as president." It is to be further observed that the instrument declared on is executed in triplicate and is signed and sealed by all parties to it. Obviously the fundamental questions for decision on the reported evidence, are: (1) Did Charles E. Reed as president of the defendant have actual authority to execute the alleged contract in the name and behalf of the company. As president his authority is defined by art. III, section 3, of the defendant's by-laws, which pro-

vides, "He shall exercise a general supervision over the affairs and the business of the company, and shall have authority to execute, together with the Secretary, in the name of the company all deeds, bonds and other contracts of the company, subject to the control and direction of the Board of Directors"; (2) Did Charles E. Reed have ostensible authority to bind the company in this contract? and (3) Did the board of directors ratify the contract?

The facts which led up to and induced the execution of the agreement by the plaintiffs and Charles E. Reed for himself and in behalf of the defendant corporation, are as follows: On September 17, 1924, the plaintiffs sent the defendant a letter directing attention to machines which they had "just completed and perfected," designed to take the bunch off the toe and heel of a last mechanically, without the use of a model, and, in the case of the heel, in such a manner as to give a perfect stick length and heel curve. The letter expressed a hope to hear from the corporation and to "have the pleasure of seeing you," presumably Charles E. Reed, in the near future. On September 24, 1924, the defendant replied to the plaintiffs' letter as follows " . . . The subject is of interest to us and Mr. Charles E. Reed will come East at an early date to investigate your proposition. There are some other matters requiring his attention here at the present time, so it will probably be about the middle of October before he can leave, and we would appreciate it very much if you could hold the matter open until that date, so as to give Mr. Reed an opportunity to call on you with a view of making some kind of deal with you if it develops that there is a satisfactory market for your inventions." The plaintiffs in a letter dated October 8, 1924, addressed to the corporation, expressed the wish that the defendant would hurry up the trip of Mr. Reed because they were receiving inquiries from last factories and they did not wish to make any statements to them until they had gone over the matter with the defendant. On October 13, 1924, the defendant, in reply, stated that Mr. Reed was out of town, "upon his return, the writer will take up the subject of your letter with him and endeavor to get him to start on his Eastern trip a little earlier

than planned. . . . Thanking you again for holding this matter up for us, we are . . . ."   On October 17, 1924, the defendant wrote the plaintiffs, "we are pleased to advise you that Mr. Reed, Sr., is leaving for the East on November 1st and is planning on calling on you on the 3rd."   On November 1, 1924, A. E. Reed, then one of the board of directors, wrote the plaintiff, "I just received word from Chicago that Mr. Charles Reed will not arrive until next Wednesday.   So you may expect to have a call from us next Thursday."

On November 12, 1924, there was a conference at the plaintiffs' factory at which were present one Hingston, a public accountant who handled most of the correspondence and office work of the plaintiffs, Charles E. Reed, Sr., his son Albert E. Reed, who was one of the defendant's board of directors, and the plaintiffs.   There the toe finishing machine and the heel finishing machine were operated; and they were examined by Charles E. Reed in the presence of his son, the plaintiffs, and Hingston.   After some of the lasts had been run through the machines, there was a general discussion about the terms of the agreement to be made.   Reed asked about the condition of the patents, that is, if there were patents on the machines or if patents had been applied for. He was told that a Mr. Hattie, a patent lawyer in Lynn, had been working on the patents for some time and had them practically ready for filing in the patent office.   Charles E. Reed asked that Hattie come down to the factory to meet him, and "bring all the drawings, applications and write up what he had of these three ideas."   The next day, November 13, 1924, Hattie came to the factory and brought with him the papers he had drafted.   These papers and drawings were spread on a desk in front of Reed and were explained by Mr. Hattie.   Reed's son stood immediately behind his father. The examination took about an hour.   During the course of the examination Reed, Sr., made suggestions as to the advisability of changes, and they were discussed by him and Hattie.   After the examination Charles E. Reed "told Mr. Hattie to finish up the papers, making all changes that were necessary, and file them with the Patent Office."   He also

told him that he was working from that time for the Reed Company and not for the plaintiffs, Ryan and Burke.

Before his talk with Mr. Hattie and after he had examined the machines, and had seen them in operation, Charles E. Reed said that in looking over the machines there was some question in his mind whether some of them did not "infringe upon his machines. He said, however, that his heel and toe machines were the only ones of their kind on the market, and in use, and that if there was an infringement on any machine, it would necessarily be on his, so that he could take a chance for that reason." He asked if Ryan and Burke would wait until the patents were granted before they were paid, and was told by Burke that there were other parties that were interested in buying these machines, and that if Reed did not want to make a deal on the machines "as is" he would go to the United Last Company in the morning, because they had signified an interest in them and were willing to take them as they were. Charles E. Reed told Mr. Hattie when he had everything ready for filing to send his bill to Charles E. Reed and Company, and that the company would send him a check in payment; and to prepare assignments of these three ideas and to have them executed by Ryan. The parties then went to the office of an attorney at law, where an agreement was drafted, read to them, and executed by them in the form in which it appeared in evidence at the trial.

On January 2, 1925, the plaintiffs wrote the defendant: "We have been expecting for the past three weeks to receive the $15,000., in preferred stock of your company, as per our agreement . . . . As it is now January, when the payment of $2,500. is due, it might be more convenient for you to send us check for the amount which you can pay and stock for the balance." On January 10, 1925, Charles E. Reed, Jr., the treasurer of the defendant, wrote in reply to the plaintiffs' letter of January 2: "Mr. Reed, Sr., has been ill since returning from his Eastern trip and will not be out for several days yet. After he had returned, he partially explained the deal made with you, but on account of his illness the subject was dropped until he had recovered."

On February 3, 1925, the defendant wrote the plaintiffs

as follows: "In reply to your telegram yesterday, we wired back as follow: 'Letter following special delivery.' When the writer wrote under the date of January 10th, he fully expected Mr. Reed to be completely recovered in a few days time. He is not yet fully able to attend to business regularly; consequently the further handling of deal has been left up to me for the present. After reading the contract carefully, it seems that both parties to the contract, in their haste to bring the deal to a close, overlooked a very important fact, that of the patent itself and a refund clause in case no patents are granted. The contract, as it stands, calls for a sum of $15,000. in cash and stock in payment for a patent application. The Board of Directors as well as our attorney interpret the contract as meaning that Charles E. Reed & Company have purchased an application only with no right or title to the patent itself stipulated, and if no patents are granted, Charles E. Reed and Company has paid out $15,000. for a worthless application with no power to recover their money in such an event. The Board of Directors, as well as Mr. Reed, consider the omission of the safeguards that we are entitled to, purely unintentional and that in entering into this agreement with Mr. Reed, Messrs. Ryan and Burke fully intended not to claim the amount of the purchase price as agreed upon if no patents were granted. Since the Directors demanded copies of the patent application, there has necessarily been some delay before the writer was in a position to communicate with you further on the subject. We have now obtained these copies, but before making the payments as originally agreed upon, we have decided that it is to our best interests as well as yours to cancel the original contract and draw up a new one acceptable to and safeguarding both parties. Since we believe the omission to be unintentional, we feel certain that you will be perfectly willing to follow the suggestion as to a new contract. If your reply is favorable, as we hope it will be, we will immediately send you a substitute contract. Assuring you that we are merely asking for what we assume you intended that we have, and anticipating a reply from you at an early date, we are . . . ." There followed letters dated February 5, 1925, February 12,

1925, and February 19, 1925, in which the plaintiffs insisted on the full performance of the agreement, and the defendant repudiated it seeking the execution of a new contract in the line suggested in its letter of February 3, 1925.

It appeared in evidence that Mr. Hattie finished the applications on November 21, 1924, had George F. Ryan, one of the plaintiffs and the alleged inventor, sign and make oath to them and at the same time make oath to the documents purporting to be assignments of these applications to the defendant; that the three patent applications, together with the three documents purporting to assign these patent applications were forwarded to the United States Patent Office, and were received and recorded in that office on January 20, February 5, and February 12, 1925, respectively; that the assignments were returned to Mr. Hattie in March, 1925, were sent by him to the defendant, in Chicago, and that since that time and down to the date of the trial these original documents purporting to be assignments have been in the possession of the defendant; that Mr. Hattie sent a bill on November 22, 1924, to the defendant "covering the expenses of the Ryan patent applications, including preparation of specification, drawings, typewriting, assignments, and Government fees," and that this bill was paid by a check dated December 31, 1924, signed "Charles E. Reed & Company, Charles E. Reed, Jr., Treasurer."

It further appeared in evidence that the defendant has been engaged in the manufacture of last finishing machinery since 1915, and in the manufacture of shoe pattern machinery for thirty years prior to 1927; that the business was founded by Charles E. Reed and another; that Charles E. Reed was active in it for many years and visited the principal shoe centers in the East in connection with the business of the defendant company; that on November 13, 1924, Charles E. Reed, Sr., was president of the company, and owned two thousand four hundred ninety-six shares of the common stock of the company, there being two thousand five hundred issued and outstanding at that time; that Charles E. Reed, Jr., was then treasurer, Helen A. Reed, wife of Charles E. Reed, Sr., was secretary, and the directors were Charles E. Reed,

Helen A. Reed, Albert E. Reed, Henry L. Wilson and Charles E. Reed, Jr.

It is the general rule, now well settled, that third persons may act upon the apparent authority conferred by the principal upon the agent and are not bound by secret limitations or instructions.  By-laws of business corporations are, as to third persons, private regulations, binding as between the corporation and its members or third persons having knowledge of them, but of no force as limitations *per se* as to third persons of an authority, which except for the by-laws would be construed as within the scope of agency.  *Fay* v. *Noble*, 12 Cush. 1.  *Rathbun* v. *Snow*, 123 N. Y. 343.  There is no evidence reported, and it is not argued by the defendant, that the plaintiffs had actual knowledge of the by-law above quoted.  *Washington & Devonshire Realty Co., Inc.* v. *Freedman*, 263 Mass. 554.  There is nothing in the contract that indicates that the president's authority to enter into the contract in behalf of the defendant was limited.  The contract expressly states that the president of the defendant company is "duly authorized"; and the agreement of Charles E. Reed, "for the purpose of adding security to the parties of the first part for the performance of the stipulations herein to be performed by the party of the third part . . . that he will personally guarantee the performance of all such agreements and stipulations," does not as matter of law charge the plaintiffs with knowledge of the limitations on Charles E. Reed's authority by force of the by-law or otherwise.  Indeed in this regard the jury were instructed, "if you find there was direct representation by Mr. Reed that his authority was limited, or if these plaintiffs should have inferred it was limited from his conversation . . . then the contract was not binding, and would not become binding until either accepted by the corporation, or in some legal manner ratified by it."

The ostensible authority of Charles E. Reed to execute the agreement warrantably could have been found from the letters of the defendant, more especially in its letter of September 24, 1924, where it is written, "we would appreciate it very much if you could hold the matter open until that

date [i.e. the middle of October], so as to give Mr. Reed an opportunity to call on you with a view of making some kind of deal with you." That the board of directors had knowledge of his action in behalf of the defendant, and that such action was with the approval of the board, could have been found by the jury from the letter of February 3, 1925, *supra*, which fully recognized, without repudiation, the fact that the contract had been executed in its behalf by its president, but sought an enlargement of its terms through an agreement of cancellation and the drafting of a new contract acceptable to both parties. Moreover, the jury would be warranted in finding a recognition of the authority of the president to purchase in its behalf the applications for patents, in its payment to Mr. Hattie for the services by him, at the request of its president, as set out in his bill rendered for services and expenses, *supra.* We are of opinion a like inference or an inference of ratification could rightly be drawn by the jury from the retention of the assignments of the three applications for patents.

The fact that the agreement bore the common and individual seal of all parties to it disposes of the defendant's contention that there was no evidence of valid consideration for the defendant's alleged promises.

We have carefully examined all the reported evidence upon the issues posited by the defendant, that the plaintiffs made false and fraudulent representations that the ideas in question were patentable for the purpose of inducing the defendant to enter into the alleged contract, and find no facts to justify that contention. See *O'Meara* v. *Smyth,* 243 Mass. 188; *Sullivan* v. *Roche,* 257 Mass. 166. Reed was granted, and he exercised, the privilege of making the fullest possible inquiry into the claim of the plaintiffs that they possessed patentable ideas, and after an extended examination of the applications, the drawings and other papers relating thereto, elected to purchase the applications as they were. The contract contained no warranty that the ideas were patentable; and all that was sold and bought was all the right, title and interest the plaintiffs had in the applications for patents. *Frey* v. *Iver Johnson Sporting Goods Co.* 212 Mass. 213, 217,

218. *Chemical Electric Light & Power Co.* v. *Howard*, 148 Mass. 352.

The defendant's request for a directed verdict in its favor was refused rightly. We find no error in the refusal of the judge to give the remaining requested rulings or in the instructions which were in fact given to the jury. It results that all exceptions must be overruled; and it is

*So ordered.*